LEXSEE 1993 U.S. DIST. LEXIS 10692

**DEBORAH QUICK SCALES, Plaintiff, v. THE GEORGE WASHINGTON UNIVERSITY, Defendant.**

**Civil Action No. 89-0796-LFO**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*1993 U.S. Dist. LEXIS 10692*

**July 27, 1993, Decided
July 27, 1993, Filed**

**JUDGES:** [*1] Oberdorfer

**OPINIONBY:** LOUIS F. OBERDORFER

**OPINION:**

MEMORANDUM

This action was brought under Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e* et seq., and was tried to the bench for twelve days from April 19, 1993 through May 5, 1993. In Count I, plaintiff alleges disparate treatment in connection with her nonselection for the position of Nursing Unit Coordinator at defendant's Medical Center. In Count II, she alleges unlawful retaliation for her filing of charges with the Equal Employment Opportunity Commission (EEOC). n1

> n1 Several additional claims raised in plaintiff's complaint were dismissed in previous rulings on summary judgment. See Memoranda and Orders dated March 25, 1991, November 18, 1991, August 21, 1992 & February 9, 1993.

After the close of plaintiff's case, counsel presented extensive arguments on defendant's motion for judgment pursuant to *Federal Rule of Civil Procedure 52(c)*. n2 On the basis of the findings and for the reasons stated below, defendant's motion [*2] will be granted: the defendant failed to select plaintiff as a Nursing Unit Coordinator not as a result of intentional discrimination, but because both persons selected were better qualified for the job; nor has she carried her burden of proving that she was the victim of retaliation.

> n2 Effective 1991, Rule 52(c) replaced a portion of the former Rule 41(b), which authorized a dismissal at the close of the plaintiff's case if the plaintiff had failed to carry an essential burden of proof. See Advisory Committee Note to *Fed. R. Civ. P. 52* (1991 Amendment). Rule 52(c) provides in relevant part:
>
>> If during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim . . . that cannot under the controlling law be maintained or defeated without a favorable finding on that issue . . . .

I. FINDINGS OF FACT

Plaintiff, a black female, was first hired by defendant's [*3] Medical Center in 1966 as a Licensed Practical Nurse I (LPN I). In 1972, plaintiff was promoted to Licensed Practical Nurse II (LPN II).

Plaintiff received an Associate of Arts degree in 1974. She was promoted to Staff Nurse I (SN I) in June of 1974, and to Staff Nurse II (SN II) in July of 1976.

In 1979, plaintiff received the degree of Bachelor of Science in Nursing. In 1981, she was promoted to Assistant Nurse Coordinator (ANC).

The position of Nursing Unit Coordinator (NUC) is equivalent to a Head Nurse position for a unit of a medical center or hospital. The position entails supervisory responsibility over all nurses on the unit.

In 1985, the NUC position for plaintiff's unit, 5-South, became vacant with the departure of Edna Hamilton, a black female. Janet Vickery, a white female, was appointed to the position of Acting NUC for 5-South. Plaintiff did not apply for the position of Acting NUC at that time. Shortly thereafter, Tammy Sparks-Jenet, a white female, was appointed to the permanent position of NUC for 5-South. Plaintiff did not apply for the perma-

nent NUC position.

In October 1986, the position of NUC for 5-South again became vacant when Tammy Sparks-Jenet was promoted [*4] to the position of Associate Director of Nursing.

Plaintiff formally applied for the permanent position of NUC for 5-South by letter dated October 28, 1986. Plaintiff was named Acting NUC for 5-South effective November 2, 1986.

When plaintiff applied for the NUC position, the principal decisionmaker charged with selecting an applicant for the position was Michael Tillman, a white male, who was then Associate Director of Nursing for defendant's Medical Center. Selection for the position was made in consultation with and with the approval of Sheila McCarthy, a white female, who was Director of Nursing for the Medical Center.

The factors considered by Tillman and McCarthy in filling the NUC position were: (1) education; (2) experience; and (3) performance during the interview process. In addition, Tillman and McCarthy took into consideration the fact that 5-South was the largest unit in the Medical Center and historically had been a difficult unit to manage properly. As a result, they deemed it important to select an individual with strong management skills.

The minimum qualifications for the position of NUC were: (1) a Master's degree in Nursing or the equivalent combination [*5] of education and experience; (2) three years of current clinical experience in the particular clinical area; (3) at least one year of supervisory experience; and (4) current District of Columbia licensure as a Registered Nurse. Plaintiff met the minimum qualifications for the position of NUC.

Plaintiff was interviewed for the 5-South NUC position on November 20, November 21, November 24 and November 26, 1986. Plaintiff's interviews did not include a lunchtime interview with personnel in NUC positions of other units.

At the time of her interviews, plaintiff had served as an ANC for approximately 5 years (from 1981 to 1986), and had served as Acting NUC for a few weeks.

At the time of her interviews, plaintiff had no credits toward a Master's degree and was not admitted into an M.S.N. program. She was, however, enrolled in a Personnel Management course at defendant's School of Continuing Education. n3

> n3 During the early 1980s, defendant had established an M.S.N. program for its nurses in conjunction with Marymount University. In July 1987, after the 5-South NUC position was filled (as described infra), plaintiff was admitted into an M.S.N. program at Marymount University. She began taking courses there in September 1987.

[*6]

Joan Michaels, a white female and outside applicant for the 5-South NUC position, was interviewed on November 10, 1986. Michaels' interviews included a lunchtime interview with personnel in NUC positions of other units.

Michaels previously had been considered and rejected for the position of NUC for an oncology unit (2-East) at the Medical Center in September 1986.

Michaels was recommended for the NUC position for 5-South by all of the interviewers with the exception of Gina Brooks. Brooks, a black female, recommended that the position be given to plaintiff. Tillman and McCarthy considered Michaels' performance in the interview process to be substantially superior to that of plaintiff. The interviewers gave Michaels "rave reviews" and considered her "dynamite," while most were "lukewarm" about plaintiff's performance in the interviews. Testimony of Tillman; accord Testimony of McCarthy. n4

> n4 This testimony of Tillman and McCarthy was elicited in plaintiff's case, and, like the bulk of their testimony, was uncontradicted by any evidence offered by plaintiff.
>
> Plaintiff's assertion that she performed very well during her interviews is not supported by any evidence in the record aside from her own personal opinion. Her opinion on this point is inherently unreliable as well as irrelevant. Gina Brooks, one of the interviewers, testified that she did not recall plaintiff's interview.

[*7]

Michaels was within a semester of completing her M.S.N. degree, while plaintiff had not completed any credits toward an M.S.N. and had not been admitted into an M.S.N. program. Thus, Michaels' educational qualifications were substantially superior to those of plaintiff.

Michaels' work experience was also superior to that of plaintiff. In particular, Michaels had held the position of Head Nurse — which is equivalent to the position of NUC — at Sibley Memorial Hospital for three years. Plaintiff had been Acting NUC for only a few weeks.

On or about December 11, 1986, Michaels was offered the position of NUC for 5-South. n5 The decision

of Tillman and McCarthy to offer the position to Michaels was based upon the determination that Michaels exceeded plaintiff in all three categories of education, experience and interview performance. n6 The evidence shows that plaintiff's race did not play a part in the decision to offer the job to Michaels instead of plaintiff.

n5 The statement by Gina Brooks that Michaels told her during her interview that she (Michaels) had been offered the position of NUC for 5-South is inadmissible hearsay and is stricken.

[*8]

n6 Plaintiff pointed to certain elements of the interview process as indicative of discriminatory animus. However, nondiscriminatory and credible explanations for each of the elements were provided by defendant's decisionmakers during plaintiff's case, and those explanations were essentially unrefuted. Thus, Michaels' and Cooley's interviews took place during a single day because they were outside candidates and such an arrangement was necessary to accommodate their schedules. The two outside candidates had lunchtime interviews for the same reason, and plaintiff did not have an interview with other NUCs because of Tillman's desire to avoid a "popularity contest" judged by the internal candidate's peers. Finally, Tillman's directive to the interviewers to avoid questions that presupposed knowledge about defendant's Medical Center in no way indicates improper bias; rather, it was a reasonable means of maintaining a level playing field among the applicants. Any anomaly shown by plaintiff in the interview process was not probative of discrimination.

In mid-January 1987, Michaels turned down the position [*9] of NUC for 5-South.

Tillman subsequently decided to re-advertise the position rather than to allow plaintiff to be promoted to NUC by default. The decision to re-advertise, in which McCarthy participated and concurred, was based on several considerations. First, Tillman desired to have more than one qualified applicant in the selection pool.

Second, Tillman and McCarthy considered plaintiff's prior performance in the interview process to be less impressive than they would like to see in a candidate for the position. For example, in Tillman's view, plaintiff had shown a lack of sensitivity to the importance of process in communication and had failed to propose ways of encouraging staff involvement.

Third, Tillman gave some consideration to plaintiff's performance as Acting NUC for 5-South, which he had had a reasonable opportunity to observe by January 1987. Although not ruling out plaintiff as a viable candidate, Tillman did have some concerns based on her performance, including her communication style, which he thought tended to cut off discussion and the exchange of ideas.

The decision to re-advertise the position of NUC for 5-South was not racially motivated.

The position was [*10] re-advertised in the Washington Post in early 1987. In response to the advertisement, Ann Cooley (subsequently Ann Cooley Pierpont), a white female and outside applicant, submitted an application.

Cooley was interviewed for the 5-South NUC position on March 13, 1987. Her interviews included a lunchtime interview with personnel in NUC positions of other units.

Cooley was recommended by all of the interviewers with the exception of Gina Brooks, who recommended against offering the position to Cooley. Tillman and McCarthy considered Cooley's performance in the interview process to be substantially superior to that of plaintiff. n7

n7 See supra note 4.

At the time of her interviews, Cooley already had received an M.S.N. degree in nursing administration. Plaintiff had not been admitted into an M.S.N. program and had completed only a single course in personnel management. Cooley also had a medical-surgical certification that plaintiff did not have. Thus, Cooley's educational qualifications were substantially superior [*11] to those of plaintiff.

Both plaintiff and Cooley had several years of ANC experience at defendant's Medical Center, as well as experience as Acting NUC with the Medical Center. In addition, however, Cooley had held the NUC-equivalent position of Head Nurse at National Rehabilitation Hospital for the past two years. In that role, Cooley had started up a new unit at the Hospital, experience that Tillman and McCarthy considered particularly important for the management of the large and challenging 5-South unit. Tillman and McCarthy reasonably deemed Cooley's work experience superior to that of plaintiff.

In addition to education, experience and interview performance, Tillman considered plaintiff's performance as Acting NUC, which, by March 1987, he had observed for four months. In his view, plaintiff's performance was less

than fully satisfactory. Tillman noted plaintiff's inability to understand concepts discussed during staff meetings, her lack of leadership ability in handling staff concerns about providing nursing care for a critical care patient in a general unit, her style of keeping her office door closed and her continued tendency to cut off discussions rather than encourage [*12] open-ended communication. n8

> n8 The only competent and reliable evidence offered by plaintiff that arguably traverses these specific concerns regarding plaintiff's performance was the testimony of Gina Brooks. However, Brooks' testimony did not specifically contradict several of the concerns expressed by Tillman. Moreover, to the extent that Brooks expressed a different view regarding plaintiff's performance — in her statement that plaintiff had strong leadership abilities — her testimony is not inconsistent with Tillman's reasonable belief to the contrary, particularly given that Tillman was charged with supervising and evaluating plaintiff. Even as to the one seemingly "objective" point on which there is direct disagreement — whether plaintiff frequently kept her office door closed — the dispute may be largely a matter of perception.
>
> In any event, plaintiff has not shown that these concerns about plaintiff's performance were not sincerely believed by defendant's decisionmakers. Further, the testimony of Tillman and McCarthy is more reliable than that of Brooks, for it is more specific, it is supported by the documentary evidence, and Tillman and McCarthy were in a superior position to review plaintiff's work.
>
> Finally, even without the concerns regarding plaintiff's performance as Acting NUC, Cooley's superior qualifications in the three areas of education, experience and interview performance were sufficient to justify the selection of Cooley instead of plaintiff.

[*13]

In April 1987, Cooley was offered the position of NUC for 5-South. The decision to offer the position to Cooley was based on the candidates' education, experience and interview performance and plaintiff's performance as Acting NUC; it was not based on race.

In mid-April 1987, plaintiff filed a charge of discrimination with the EEOC, claiming that the denial of the NUC position was racially discriminatory. She notified Tillman of the filing of the discrimination charge.

On May 19, 1987, Cooley began her employment with defendant's Medical Center.

By letter dated May 25, 1987, plaintiff complained to McCarthy about a lack of support from Tillman in the performance of her duties as Acting NUC for 5-South. In her letter, plaintiff stated that Tillman had not permitted her to attend meetings on May 21 and May 22, 1987. The letter did not mention any refusal to allow plaintiff to attend earlier meetings, or her assertion that the lack of support was due to retaliatory animus on Tillman's part.

McCarthy met with plaintiff after receiving the letter. During that meeting, plaintiff did not mention any retaliatory or discriminatory motive, and McCarthy told plaintiff to attempt to resolve [*14] her difficulties directly with Tillman.

On June 14, 1987, plaintiff was officially returned to her previous position as ANC.

On June 26, 1987, Tillman asked plaintiff to reconsider the performance appraisals of the other ANCs that she had prepared while Acting NUC. Tillman expressed concern that all of the ANCs had been rated as "exceeds requirements" in all categories, and that no areas of improvement had been identified for any of the ANCs. Such ratings appeared particularly inappropriate, in Tillman's view, because of a series of narcotics violations on 5-South reflecting the ANCs' failure to supervise properly the handling of narcotics by lower-level employees. n9

> n9 Tillman's explanation of his directive to reconsider the evaluations was uncontradicted. Tillman issued the directive for the reasons stated and not in retaliation for plaintiff's filing of a discrimination charge.

Plaintiff's own performance evaluation for 1986-87, which was prepared by Tillman, reflected an overall rating of "exceeds requirements." [*15] In each specific category plaintiff was rated either "meets requirements" or "exceeds requirements."

Tillman submitted a copy of plaintiff's 1986-87 evaluation to the Payroll office before showing it to plaintiff in order to ensure that her pay raise would be processed promptly. n10 Tillman had left the "position title" and other sections of the first page of the evaluation form blank when he showed it to plaintiff on July 14, 1987. Upon being provided with oral comments by plaintiff, Tillman completed the first page of the evaluation and submitted the original to Personnel. Plaintiff refused to sign the evaluation and told Tillman that she would provide written comments.

> n10 Plaintiff has failed to introduce any support

for her repeated suggestion that Tillman diverged from common practice in the manner in which he forwarded a copy of plaintiff's 1986-87 evaluation to Payroll to ensure timely receipt of her pay raise.

There is no reliable evidence that Tillman treated plaintiff differently or took any adverse [*16] action because of plaintiff's filing of a discrimination charge with the EEOC. n11

> n11 Plaintiff alleged a lack of support from Tillman both before and after the filing of her discrimination charge, negating the inference of a causal connection between the filing and the alleged lack of support. The meetings from which plaintiff allegedly was excluded took place after Cooley's arrival, and there is no indication that plaintiff should have been present in addition to Cooley. Similarly, there is no reliable evidence that any of the other actions put forward by plaintiff had anything to do with the filing of plaintiff's EEOC charge.

Plaintiff testified to some difficulties she experienced with Cooley, the new NUC for 5-South, involving plaintiff's work schedule and the placement of some negative information in plaintiff's file. Plaintiff initially testified that these incidents reflected retaliatory motivation on Cooley's part. Upon further examination, however, plaintiff effectively retracted her earlier statement [*17] and admitted that the problems were simply due to Cooley's lack of familiarity with defendant's personnel procedures.

In any event, there is no evidence of a causal connection between any adverse action of Cooley and plaintiff's filing of the discrimination charge.

On November 24, 1987, plaintiff tendered her resignation, effective December 8, 1987. Plaintiff resigned voluntarily. There is no evidence that plaintiff faced circumstances in her employment under which a reasonable employee would have felt forced to resign.

Plaintiff presented statistical evidence reflecting the racial composition of the Medical Center's workforce between January 1981 and August 1989. For example, of the 532 individuals in nursing management positions during this period, 84.9 percent were white, while 10.8 percent were black. Of the Medical Center's 60 NUCs (within the nursing management category), 86.7 percent were white and 8.3 percent were black. In the combined total of nursing management and professional positions requiring an R.N. license, 82.7 percent of the 3,085 individuals were white, while 10.6 percent were black.

Of the 2,967 individuals in nonmanagement, non-R.N.-required positions [*18] (including patient escort, secretarial and clerical positions), 69 percent were black and 19 percent were white.

There is no reliable evidence that the Medical Center's workforce was intentionally segregated on the basis of race. The evidence reveals that defendant administered Equal Employment Opportunity and Affirmative Action policies in employment decisions for its Medical Center before, during and after the events directly at issue in this case. Defendant engaged in efforts to recruit black nurses for the Medical Center's professional and management positions. n12

> n12 Plaintiff repeatedly refers to a statement of an unnamed doctor in a January 1987 report that the Medical Center has "an understructure of Black underpaid workers who have a camaraderie among themselves, but who do not give a damn about the hospital institution as a whole" and that "racial separation on the basis of race is extremely strong." Plaintiff's use of these statements is inadmissible hearsay, and the document in question was expressly admitted not for the truth of the matter asserted, but to show McCarthy's knowledge of the document. McCarthy testified not only that defendant engaged in efforts to recruit blacks prior to issuance of the 1987 report, but that defendant intensified its recruitment efforts after issuance of the report.

[*19]

The ultimate facts are that both Michaels and Cooley were better qualified to be NUC for 5-South than was plaintiff, defendant had nondiscriminatory reasons to readvertise the position when Michaels proved not to be available, and defendant ultimately selected Cooley instead of plaintiff for the position for nondiscriminatory reasons.

II. CONCLUSIONS OF LAW

A.

Plaintiff has attempted to meet the burden of proof on her discrimination claim in three ways. First, she offered statistical evidence purporting to establish disparate treatment of plaintiff and other black employees. Second, she attempted to show patterns and practices of discrimination through the use of comparative charts. Finally, she attempted to prove individual disparate treatment using the indirect method of proof established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

As explained more fully below, because plaintiff

has failed to carry her burden of proving discrimination against her, and because of the order in which she presented her case, it is ultimately unnecessary to decide whether she has established a prima facie case; in any event, plaintiff has offered [*20] insufficient evidence — in the form of either direct evidence or circumstantial evidence that defendant's offered reasons were pretextual — that defendant's action in not selecting plaintiff for the 5-South NUC position was based on race.

1.

Reliable and probative statistical evidence may be used to establish a prima facie case of disparate treatment under Title VII. See *Davis v. Califano, 198 U.S. App. D.C. 224, 613 F.2d 957, 962 (D.C. Cir. 1979)*.

On April 19, 20 and 21, 1993, plaintiff presented testimony from and a variety of charts prepared by Dr. Jonathan W. Work, who was educated and has worked for several years on issues of discrimination in the workplace and in the field of econometrics. Work was conditionally qualified to testify as an expert on the racial composition of defendant's workplace and how that composition came about.

Initially, Dr. Work presented his findings regarding the employment of blacks at defendant's Medical Center. Dr. Work's analysis purported to show that they were substantially underutilized in management and professional positions with the Medical Center.

It soon became apparent, however, that Dr. Work's analysis was seriously flawed [*21] and therefore unreliable and of limited probative value. It is settled that such employment statistics must be considered in the context of the relevant labor market. See *Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989); Davis v. Califano, 613 F.2d at 963* (statistics must compare "the relevant work force and the qualified population in the relevant labor market"). Dr. Work attempted to perform an analysis based on the 1980 Bureau of the Census Characteristics of the Population, Detailed Population Characteristics for the District of Columbia. A fair reading of that report makes clear that the labor market data used in Dr. Work's analysis were limited to the geographical confines of the District of Columbia, rather than the Washington metropolitan area or the area including the District, Virginia and Maryland. n13 Because the Medical Center's nurses do not come exclusively from the District of Columbia, Dr. Work's utilization analysis was premised on an incorrect labor market. See *Hammon v. Barry, 264 U.S. App. D.C. 1, 826 F.2d 73, 77 (D.C. Cir. 1987)* (relevant labor market is Washington metropolitan [*22] area, not confines of D.C.).

n13 See 1980 Census of Population, U.S. Department of Commerce, Bureau of the Census, Appendix B at B-12. This document was used by defendant during the voir dire of Dr. Work as Defendant's Exhibit 96. Further, as an official government publication, it may by judicially noticed by the Court.

In any event, when the labor market problem with Dr. Work's analysis came to light during presentation of plaintiff's case, plaintiff withdrew it.

The other statistical evidence offered through Dr. Work consisted of internal Medical Center data intended to demonstrate a racial imbalance in the workforce. Although these exhibits and testimony were admitted for what they are worth, they probably do not constitute reliable evidence sufficient to establish a prima facie case of discrimination.

First, Dr. Work merged data for the period 1981 through 1989, rather than focusing on the specific period in question, December 1986 through March 1987. While such an approximation does not render the data [*23] completely irrelevant, it does diminish their probative value.

Second, individuals were counted multiple times if they held different positions during the surveyed period, further tending to skew the results.

Third, and most important, Dr. Work's comparative analysis failed to account for the specific qualifications for the different positions. Thus, the comparison of lower-level positions such as LPN, patient escort and clerical jobs — which have no R.N. licensure requirement — with positions that do require an R.N. license is not a relevant comparison. The case law indicates that only individuals with the relevant qualifications may provide the basis for a comparison that is probative of discrimination. See *Wards Cove, 490 U.S. at 651-52; Hammon, 813 F.2d at 427 n.31*. Plaintiff failed to show that employees at higher and lower levels in the employment hierarchy possessed qualifications and experience sufficiently similar to the NUC position to justify comparison.

In the final analysis, Dr. Work's statistical evidence showed merely that there were greater numbers of whites in certain positions than there were [*24] blacks. From this fact, coupled with his determination that the disparity was not attributable to chance, Dr. Work concluded that intentional discrimination by the defendant was the explanation. That ultimate conclusion, however, was not based on reasonably reliable scientific analysis; it failed to consider alternative determinants (such as socio-economic factors, licensing requirements and educational qualifica-

Case 1:05-cv-01184-JMF    Document 23-6    Filed 06/26/2006    Page 7 of 11

Page 7
1993 U.S. Dist. LEXIS 10692, *24

tions), as well as the lack of any reliable comparison to the relevant labor market and the other problems identified above.

The Supreme court has recently addressed the trial court's role in deciding whether to admit "expert" scientific evidence in a federal trial. In *Daubert v. Merrell Dow Pharmaceuticals, Inc., 125 L. Ed. 2d 469, 61 U.S.L.W. 4805, 1993 U.S. LEXIS 4408,* *8 (June 28, 1993), the Court made clear that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." In particular, the Court instructed that the "helpfulness" standard of *Federal Rule of Evidence 702* n14 requires a valid scientific connection to the pertinent inquiry as a precondition [*25] to admissibility." Id. at *10.

> n14 Rule 702 provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Court held in Daubert that the "general acceptance" test of *Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923),* was superseded by the adoption of the Federal Rules of Evidence.

From these teachings it follows that Dr. Work's ultimate opinion that the workforce data evidence intentional discrimination by defendant is not derived from a reliable scientific analysis. Accordingly, if this issue were dispositive, that opinion would be inadmissible under Rules 702 and 403 as explicated by Daubert, and it would be disregarded.

The workforce data themselves, which reflect the racial breakdown of various categories of positions within [*26] the Medical Center between 1981 and 1989, are admissible. However, for the reasons stated previously, they have very limited probative value and, if the issue were dispositive, would be insufficient to establish a prima facie case of discrimination.

Even if the statistical evidence offered by plaintiff were sufficient to establish a prima facie case of disparate treatment, plaintiff has failed to present sufficient evidence to survive defendant's Rule 52(c) motion. In order to have standing to challenge the disputed conduct, plaintiff must make a showing that she was injured by that conduct. See generally *Allen v. Wright, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984). See also East Texas Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403-05, 52 L. Ed. 2d 453, 97 S. Ct. 1891 (1977)* (unqualified applicants lacked standing to represent class in Title VII action). Even if some employees suffered from impermissible discrimination, there is no credible evidence, or in any event, insufficient evidence, that plaintiff's nonselection for the position of NUC for 5-South was racially motivated.

Nor can plaintiff's attempts to show individual disparate treatment through the [*27] indirect method of proof prevail. As demonstrated hereafter, she has failed to carry her burden of establishing that defendant's reasons for nonselection were pretextual (and discriminatory). Rather, plaintiff has adduced evidence from the direct and cross-examination of witnesses whom she called that supports defendant's position that the reasons were not pretextual, but were legitimate and nondiscriminatory.

2.

In support of her claim that defendant engaged in a "pattern or practice" of discrimination, plaintiff's principal evidence consisted of a series of "comparative charts" purporting to show that whites were promoted to NUC positions more often than blacks. Again, however, serious deficiencies in plaintiff's evidence preclude the establishment of a prima facie case, or the carrying of her burden of proof on the merits.

First, the comparative charts conspicuously omit any experience gained from employment other than with defendant. While all of plaintiff's professional experience (including pre-R.N. experience) was at defendant's Medical Center, it is clear that many of the other nurses have experience prior to their employment with defendant that is not reflected in the [*28] charts.

Second, the charts lack information on the educational credentials of several of the nurses, and thus are incomplete in this important aspect as well.

Third, the charts include information about a number of nurses who were not within the Department of Nursing of the Medical Center. Because the employment of these nurses was not under the control of the decisionmakers involved in this case, Tillman and McCarthy, this information is irrelevant.

Because of these defects, plaintiff's comparative charts are neither reliable nor probative. Further, plaintiff's evidence fails to show, through an analysis of the qualifications of the applicants for any particular NUC position or through analysis of personnel files, that whites were promoted routinely when they were not the best qualified applicants for the positions involved. The infor-

mation contained in plaintiff's comparative charts (aside from being incomplete) is essentially anecdotal in nature.

In contradiction to plaintiff's assertion of a pattern of discrimination in the selection of NUCs, McCarthy testified that she had hired several black employees for the position of NUC, from both inside and outside the Medical Center, [*29] and that the black applicants had had white competitors. McCarthy also testified that the NUC positions were advertised outside the Medical Center, and that in each instance the most qualified applicant was selected, irrespective of race. Plaintiff has provided insufficient probative evidence to refute McCarthy's testimony.

Even if the comparative charts were adequate to make out a prima facie case of a pattern or practice of discrimination by the defendant, plaintiff has nevertheless failed to carry her burden of showing redressable discrimination. As noted above, plaintiff, to have standing, must show that she was denied the position of NUC because of discrimination. However, plaintiff has not shown that she was better qualified for the 5-South NUC position than her competitors, nor has she shown that defendant's reasons for not selecting her were pretextual or ultimately discriminatory. Rather, her own evidence sustains defendant's position that the reasons were legitimate and nondiscriminatory.

3.

In order to establish a prima facie case of individual race discrimination, a plaintiff must show: (1) that she belongs to a racial minority; (2) that she applied and was qualified [*30] for a vacant position; (3) that she was rejected for the position; and (4) that a white applicant with equivalent credentials was offered the position, or alternatively, that the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*.

Once these facts are established, the employer must then produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. When the employer's nondiscriminatory reason has been presented, the presumption of discrimination "'drops from the case.'" *St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407, 61 U.S.L.W. 4782, 1993 U.S. LEXIS 4401*, *11 (June 25, 1993) (quoting *Burdine, 450 U.S. at 255*) (emphasis added).

The plaintiff then has the opportunity to demonstrate that the employer's proffered reason was not the true reason for the decision. A demonstration that the employer's proffered [*31] reason was pretextual permits the trier of fact to infer the ultimate fact of intentional discrimination; however, as the Supreme Court held last month in St. Mary's Honor Center, a showing of pretext does not compel either a finding of discrimination or a judgment for the plaintiff. Id. at *16. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that she was the victim of intentional discrimination. Id. at *11; *Burdine, 450 U.S. at 253, 256*.

At the point when the employer has offered its nondiscriminatory reason for the employment decision, the trier of fact is in a position "to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [him]' because of his race." *St. Mary's Honor Center, 1993 U.S. LEXIS 4401*, at *15 (quoting *Burdine, 450 U.S. at 253)*.

In this case, defendant has conceded the first three elements of a prima facie case: that plaintiff (1) belongs to a racial minority, (2) applied and was qualified for the NUC position, and (3) was rejected for the position. [*32] Defendant also concedes that the candidates offered the position, Michaels and Cooley, were white; defendant does not concede, however, that those candidates were only as qualified for the position as plaintiff. As set forth in the Findings of Fact, supra, defendant's decisionmakers reasonably determined that plaintiff was not as qualified for the NUC position as either Michaels or Cooley. It appears, therefore, that plaintiff has not established a prima facie case of individual disparate treatment based on race.

At the same time, it must be recognized that many cases treat the plaintiff's prima facie case under McDonnell Douglas as relatively easy to establish, and it may be that plaintiff's minimal qualification for the NUC position is sufficient to satisfy the fourth prong of the prima facie case. Accordingly, defendant's Rule 52(c) motion is considered on the hypothesis that plaintiff has established a prima facie case.

Ordinarily under such circumstances, it would be difficult for a defendant to prevail on a Rule 52(c) motion. Following the presentation of plaintiff's prima facie case, defendant would be obliged to come forward in its case with proof of nondiscriminatory [*33] reasons for the decision in question, and the plaintiff, in rebuttal, would present her evidence of pretext.

This case, however, is different. Plaintiff chose to proceed by calling the decisionmakers in her case-in-chief and eliciting from them the reasons for the disputed decisions. Thus, the employer's legitimate, nondiscriminatory reasons for the decisions were presented during plaintiff's case. Plaintiff then attempted, in her case, to show that those reasons were pretextual. As plaintiff stated, she "offered her evidence of pretext during her case in chief."

n15

> n15 Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 39. The strategy adopted by plaintiff's counsel appeared to be the risky one of putting defendant's decisionmakers on the stand and examining them at length in an attempt to extract a confession or catch them in a contradiction. The risks of such a strategy became clear at the trial: the witnesses did not confess to discrimination on the basis of race, nor did they make any material contradictions; they did, however, explain their nondiscriminatory reasons for not selecting plaintiff for the NUC position. Plaintiff chose to proceed in this manner despite strong urging by the Court during two pretrial conferences that the trial should proceed in the order established by McDonnell Douglas's indirect method of proof.

[*34]

Because, at the close of plaintiff's case, defendant's nondiscriminatory reasons have been presented, the presumption of discrimination "drops from the case" under St. Mary's Honor Center and Burdine. This leaves for resolution the ultimate issue of intentional discrimination vel non. n16

> n16 As the Court explained in St. Mary's Honor Center: "If . . . the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework — with its presumptions and burdens — is no longer relevant." *1993 U.S. LEXIS 4401,* at *15.

As explained below, plaintiff has presented insufficient probative evidence to carry her burden of showing that defendant's offered reasons for the decisions in question were pretextual or that plaintiff's nonselection was the result of discrimination based on race; rather, plaintiff's proof establishes that defendant employed a person better qualified for the position. n17

> n17 The one reason that a court might hesitate to grant a defendant's Rule 52(c) motion even after the plaintiff has offered her evidence of pretext in her case-in-chief is the following: theoretically, a defendant might offer in its case a previously undisclosed nondiscriminatory reason for the disputed decision, and a plaintiff might benefit from the opportunity in rebuttal to demonstrate that that new reason is pretextual. This possibility, while perhaps significant in other cases, is not of concern here for several reasons.

First, this case has seen 12 days of trial, as well as extensive discovery and numerous substantive motions over the course of four years. There is no secret or genuine dispute about which nondiscriminatory reasons were going to be offered by the defendant; it is simply implausible that previously undisclosed nondiscriminatory reasons would be put forward in defendant's case. It is noteworthy in this regard that "the McDonnell Douglas methodology was never intended to be rigid, mechanized, or ritualistic." *St. Mary's Honor Center, 1993 U.S. LEXIS 4401,* at *31-32 (citation and internal quotations omitted).

Second, as St. Mary's Honor Center makes clear, a finding of pretext does not necessitate a finding of discrimination. Even if an additional nondiscriminatory reason offered by defendant were shown to be pretextual, intentional discrimination would not be found in this case. Rather, the finding would still be that plaintiff's nonselection was because she was less qualified than the other applicants, not because of her race.

Finally, plaintiff has not argued this point in its filings or oral argument on defendant's motion.

[*35]

The testimony of Tillman and McCarthy clearly established that they reasonably considered plaintiff to be less qualified for the 5-South NUC position than Michaels and Cooley. The latter two applicants exceeded plaintiff in each of the three areas to be considered: experience, education and interview performance. In addition, with respect to the decision to re-advertise the position (after Michaels had declined it) and the decision to offer the position to Cooley, the decisionmakers took into consideration genuine concerns they had about plaintiff's performance as Acting NUC for 5-South. These reasons for defendant's decision not to select plaintiff for the NUC position are plainly legitimate, nondiscriminatory reasons, and they are supported by documentary evidence as well as the consistent testimony of Tillman and McCarthy.

Plaintiff attempted to establish that the M.S.N. degree was not a valid educational requirement for the NUC position by proffering further testimony of Dr. Work and two exhibits prepared by him. Dr. Work utilized one fact (overall performance) derived from multi-page annual performance evaluations of 42 incumbent NUCs, and compared it to the educational [*36] level of each of the NUCs. He concluded that there was no statistically significant difference in the average overall performance ratings of NUCs associated with educational attainment. As with Dr. Work's other evidence, his analysis of the M.S.N. degree

qualification is fatally flawed.

First, Dr. Work utilized different years and different numbers of years for each surveyed NUC. Thus, the analysis is not based on a uniform pool of data and therefore is unreliable.

Second, he did not control for the different supervisory personnel who prepared the evaluations of each individual.

Third, Dr. Work utilized a single educational level for each NUC, even though some of them changed educational levels while in the NUC position.

Fourth, the analysis did not consider partial advancement toward the next educational level.

Fifth, the sample size used in Dr. Work's analysis is too small to yield scientifically reliable conclusions for the type of analysis performed. n18

> n18 See Schmidt & Hunter, The Future of Criterion-Related Validity, Personnel Psychology 33 (1980); Schmidt, Hunter & Urry, Statistical Power in Criterion-Related Validation Studies, J. Applied Psych., Vol. 61, No. 4, at 473-85 (1976). The Court takes judicial notice of these scholarly publications.

[*37]

Finally, Dr. Work's analysis fails to control for the work experience of the incumbent NUCs, either in the NUC role or prior to that role. Prior experience obviously would be expected to have a major impact upon performance.

Taken together, these deficiencies in Dr. Work's analysis render it inaccurate and without genuine probative value. Moreover, McCarthy testified persuasively and without contradiction that the M.S.N. degree is given great weight in the professional nursing community for nursing management positions. She had overseen the establishment of an M.S.N. program for defendant's nurses in conjunction with Marymount University. McCarthy also indicated that it was important to encourage attainment of that educational degree in order to maintain the skills level required for continued competitiveness, and she cited support for the validity of the M.S.N. qualification in the professional literature. In any event, the evidence is persuasive that defendant applied the M.S.N. qualification in good faith as a valid criterion, and there is no competent evidence showing that it was applied as a pretext for discrimination. n19

> n19 Plaintiff contends that the M.S.N. requirement was manipulated by the defendant and points out that the degree was variously "required" and "preferred" for NUC positions at different times. As explained by the uncontradicted testimony of McCarthy, however, the M.S.N. qualification changed only in response to the needs of the Medical Center and the limitations of the labor market. At all times, McCarthy desired to have an M.S.N. requirement for NUC positions, but such a requirement was not feasible during shortages of nursing personnel.

Plaintiff also argues that she met the educational qualification because she had experience that was equivalent to an M.S.N. Plaintiff confuses the entry-level qualification — "A Master's degree in Nursing or the equivalent combination of education and experience" — with being the best qualified for the position. Other things being equal, it is permissible for an employer to consider greater educational attainment a positive factor in an employment decision.

[*38]

Plaintiff suggests that Michaels was preselected for the 5-South NUC position. She relies on a selection document bearing the date of September 19, 1986. It is clear from the document itself, however (as well as the uncontested testimony of Tillman), that the same document was used for the earlier denial of Michaels' application for NUC of 2-East and for offering her the 5-South position. n20 There is no competent evidence supporting plaintiff's suggestion of Michaels' preselection.

> n20 Gina Brooks' statement regarding Michaels' alleged preselection is inadmissible hearsay. See supra note 5.

Plaintiff asserts that defendant violated its own policies by failing to promote plaintiff before considering outside applicants. The relevant provision of defendant's Manual of Employment Directives states: "Before outside recruitment sources are explored, Personnel Services will review its applicant files, including those previously screened for University employment." This directive simply ensures that Personnel identifies [*39] existing sources of applicants (including prior outside candidates for other positions, such as Michaels). It does not preclude the consideration of outside applicants or the hiring of better qualified outside applicants. Moreover, the policy is imposed on Personnel Services, not the decisionmakers involved here, and no evidence has been offered that Personnel Services violated the policy.

1993 U.S. Dist. LEXIS 10692, *39

Plaintiff also points to differences in the interview process as proving discriminatory animus. However, anomalies in personnel procedures do not necessarily show unlawful discrimination. See *Oates v. District of Columbia, 262 U.S. App. D.C. 360, 824 F.2d 87, 93 (D.C. Cir. 1987); Ledoux v. District of Columbia, 261 U.S. App. D.C. 114, 820 F.2d 1293, 1306-07 n.22 (D.C. Cir. 1987)*. As set forth in the Findings of Fact, the differences were credibly explained and suggest no improper motivation. See supra note 6.

Plaintiff has failed to offer evidence sufficient to show that defendant's nondiscriminatory reasons for its employment decisions are unworthy of credence, or that those decisions were racially motivated. Rather, she adduced evidence supporting defendant's position [*40] that its reasons were legitimate and nondiscriminatory. Accordingly, she has failed to carry her burden under Rule 52(c).

B.

There remains for consideration plaintiff's retaliation claim. To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that the defendant took an adverse personnel action against the plaintiff; and (3) that the adverse personnel action was causally related to the plaintiff's exercise of protected rights. *Berger v. Iron Workers Reinforced Rodmen Local 201, 269 U.S. App. D.C. 67, 843 F.2d 1395, 1423 (D.C. Cir. 1988)*.

Following plaintiff's filing of an EEOC charge in April 1987, she received a favorable evaluation (an overall "exceeds requirements") as well as a pay raise. Such an evaluation and pay increase cannot possibly be construed as an adverse personnel action. Nor did Tillman's directive to plaintiff to reconsider her evaluations of other ANCs, or his temporary failure to complete the front page of an evaluation form, constitute an adverse employment action.

Plaintiff's principal assertion with respect to Tillman appears to be that he prevented her from attending certain meetings [*41] in April or May of 1987. n21 However, such minor events with little or no concrete impact on plaintiff's employment situation do not rise to the level of adverse personnel actions. See, e.g., *Pinar v. Dole, 747 F.2d 899, 912 (4th Cir. 1984)*, cert. denied, *471 U.S. 1016, 85 L. Ed. 2d 301, 105 S. Ct. 2019 (1985); Gold v. Gallaudet College, 630 F. Supp. 1176, 1189 (D.D.C. 1986); Johnson v. University of Pittsburgh, 435 F. Supp. 1328, 1360 (W.D. Pa. 1977)*.

n21 As set forth in the Findings of Fact, supra, plaintiff initially suggested that some problems she experienced with Cooley were also in retaliation for her filing of an EEOC charge. Plaintiff conceded on the stand, however, that the problems were merely the result of Cooley's lack of familiarity with defendant's personnel procedures. In any event, these alleged actions on Cooley's part do not constitute adverse personnel actions, and there is no evidence that they were causally related to plaintiff's protected activities (or even that Cooley was aware of such activities).

[*42]

Plaintiff presented no reliable evidence that the defendant "deliberately made . . . working conditions intolerable and drove [her] into an involuntary quit." *Retail Store Employees Union Local 880 v. NLRB, 136 U.S. App. D.C. 27, 419 F.2d 329, 332 (D.C. Cir. 1969)*. Thus, there is no basis for a conclusion that plaintiff's decision to resign involved a "constructive discharge." See also *Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1987)*.

In addition, there is insufficient evidence of a causal connection between any of the alleged adverse actions and plaintiff's filing of her discrimination charge. Indeed, the evidence presented in plaintiff's case negated an inference of causation, for plaintiff complained of a lack of support from Tillman before as well as after the filing of the charge.

Because plaintiff has failed to establish a prima facie case of retaliation for her protected activity, or to carry her burden of proof on the merits, her retaliation claim fails under Rule 52(c).

* * * *

For the foregoing reasons, an accompanying Order enters judgment for defendant pursuant to *Federal Rule of Civil Procedure 52(c)*.

Dated: July [*43] 27, 1993

Louis F. Oberdorfer

UNITED STATES DISTRICT JUDGE

ORDER – July 27, 1993, Filed

For the reasons stated in the accompanying Memorandum, it is this 27th day of July, 1993, hereby

ORDERED: that defendant's motion for judgment as a matter of law under *Fed. R. Civ. P. 52(c)* should be, and is hereby, GRANTED; and it is further

ORDERED: that judgment is hereby entered in favor of defendant on all remaining counts.

Louis F. Oberdorfer

UNITED STATES DISTRICT JUDGE