UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YVONNE GIPSON, </br></br>       Plaintiff, </br></br>    v. </br></br> WELLS FARGO </br>   BANK, N.A., </br></br>       Defendant. | ) </br> ) </br> ) </br> ) </br> ) Civ. Action No. 05-1184 (JMF) </br> ) Civ. Action No. 00-2865 (JMF) </br> ) </br> ) </br> ) </br> ) </br> ) |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE EXPERT REPORT**

**PRELIMINARY STATEMENT**

When Wells Fargo alleges that Yvonne Gipson, whom it employed to originate home mortgage loans, was terminated for violating the company's "fraud" policy, it means nothing except that there were one or more faxed documents in her borrowers' loan files (Tankus Dep. at 111-12; Gentry Dep. at 127-30). Wells Fargo's "fraud" investigation did not confirm that either Ms. Gipson or borrowers failed to provide original documents before their loans were closed (Gentry Dep. at 129-30). Nor did it disclose that Ms. Gipson had caused financial loss (Gentry Dep. at 104-05, 111; Pattison Dep. at 78-79).

Neither, for that matter, did Wells Fargo's investigation reveal that Ms. Gipson had engaged in fraud or misrepresentation; that she had known that documents in her loan files were fraudulent or contained misrepresentation; or that she failed to focus on the possibility of fraud in her application files (Gentry Dep. at 123-24; Pattison Dep. at 59-60; Tankus Dep. at 115-16). No one connected with the investigation of Ms. Gipson or the process that led to her

termination believed that she engaged in fraud or misrepresentation or knew of any in her loan files (Pattison Dep. at 59-60).[1]

The only "fraud" policy that Wells Fargo found that Ms. Gipson supposedly violated was accepting faxed documents in the first instance from realtors (Gentry Dep. at 127-30). Yet by its own managers' admission, Wells Fargo provides extensive processing support to loan originators, the very purpose of which is to review loan files closely and obtain missing documents to ensure that loans are ready to be funded (Tankus Dep. at 29-39, 42-49; Foss Dep. at 17, 24-25; Harper Dep. at 77-78). Wells Fargo nonetheless contends that it terminated Ms. Gipson's employment because she accepted some faxed documents in the first instance from realtors, even though there was no reason to believe that borrowers failed to provide original documentation before closing (Gentry Dep. at 127-30; Frohn Dep. at 106-07).

The "ultimate issue for resolution in" No. 05-1184 is whether Wells Fargo engaged in retaliation when it terminated Ms. Gipson. Pullman-Standard v. Swint, 456 U.S. 273, 286 (1982). Plaintiff intends to adduce an extensive body of evidence which challenges the subjective reason articulated by defendant and to demonstrate, among other matters, that: (i.) Ms. Gipson was terminated even though other, similarly situated loan originators who had not pursued EEO complaints were only counseled; (ii.) Wells Fargo's practice was not to terminate loan originators for disciplinary reasons except in cases of actual fraud; and (iii.) the manager who made the decision to

---

[1] Neither, for that matter, did Wells Fargo's investigation confirm that Ms. Gipson failed to meet face-to-face with loan applicants (Gentry Dep. at 128), or that she had written the substance of credit explanations for applicants (Id.; Tankus Dep. at 101-03).

terminate Ms. Gipson did so in contravention of Wells Fargo standard business practices and for grounds different from those confirmed by its investigator.

Plaintiff also intends to adduce objective expert testimony disputing Wells Fargo's assessment of the severity of Ms. Gipson's alleged misconduct, which by its own admission was supposedly a factor in deciding to terminate her (Frohn Dep. at 77-78). Doing so is a well-recognized means of challenging the "truthfulness" of the subjective reasons articulated by an employer for taking adverse action. Coles v. Perry, 271 F.Supp. 2d 157, 162 (D.D.C. 2003) (Facciola, J.). Plaintiff's witness, Frederick C. Douglas, Jr., is a former Deputy Assistant Secretary for Single Family Housing of the Department of Housing and Urban Development and eminently well-qualified to render expert testimony in this case (Exh. 1).

Drawing upon his extensive experience with the federal government, and overseeing and working with private mortgage lenders, Mr. Douglas has given an expert opinion that directly contradicts Wells Fargo's self-serving contentions about the supposed severity and seriousness of Ms. Gipson's alleged misconduct. Mr. Douglas' opinion convincingly demonstrates that Ms. Gipson's acceptance of faxed documents could not possibly be considered fraud, would not have resulted in any sanction to Wells Fargo, and are viewed by private industry to amount to nothing more than good competitive customer service (Exh. 2).

Nowhere do the words "discrimination" or "retaliation" appear in Mr. Douglas' expert report. On the contrary, Mr. Douglas's expert

testimony provides considerable objective evidence that Wells Fargo has grossly exaggerated the supposed importance and impact of Ms. Gipson's "misconduct" in the attempt to justify terminating her. His most important opinions, which went unmentioned by Wells Fargo, include the following

> Overall, the acts that Ms. Gipson allegedly committed, and I reiterate that I assumed for purposes of this Report that she did, were not unusual or uncommon, either in the context of an FHA or a conventional mortgage loan. They did not endanger Wells Fargo's status as an approved FHA lender, and did not suggest that Ms. Gipson was derelict in her responsibility as a loan originator.
>
> <u>The acts she engaged in are common throughout the mortgage loan industry and often viewed as a part of customer service</u>.
>
> The fact that original documents were needed before a particular mortgage loan should have been closed, as well as the possibility of detecting suspected fraud or misrepresentation, are viewed by HUD/FHA and the conventional residential mortgage industry as the responsibility of loan processors and underwriters, not loan originators.

(Exh. 2 at 9-10) (emphasis supplied). Mr. Douglas' expert opinion is unquestionably admissible.[2]

---

[2] The stipulated Scheduling Order of September 19, 2005, reflects Wells Fargo's agreement to make its expert disclosures than 30 days after plaintiff's, as provided in Rule 26(a)(2), Fed. R. Civ. P. Wells Fargo's motion concludes with a request to postpone its disclosures until the Court adjudicates its motion (Def. Mot. at 12). Wells Fargo failed to offer any grounds in support of its request.

**ARGUMENT**

**DEFENDANT'S MOTION TO STRIKE MUST BE DENIED**

Mr. Douglas' expert assignment focused on a number of issues, which included evaluating the supposed severity of Ms. Gipson's conduct; the prevalence of her actions in the residential mortgage industry; the objective industry view on whether actions such as Ms. Gipson's constitute misconduct; the likelihood that Wells Fargo's loan processors would have obtained copies of any documents missing from Ms. Gipson's files; the possibility that Ms. Gipson's acceptance of fax documents could have led to fraud; and the seriousness of Ms. Gipson's activities in terms of the possibility for Wells Fargo to be sanctioned as a result (Exh. 3). Mr. Douglas' opinions, which he is eminently qualified to render, provide important objective evidence about the veracity of Wells Fargo's self-serving account of its reasons for terminating Ms. Gipson.

<u>The Background of Plaintiff's Expert</u>

Mr. Douglas is exceptionally well-qualified to serve as an expert witness in this case. He formerly served as Deputy Assistant Secretary of Single Family Housing of the Department of Housing and Urban Development ("HUD") and reported directly to the Federal Housing Commissioner. As Deputy Assistant Secretary, Mr. Douglas had overall responsibility for HUD programs designed to promote low and moderate income affordable single family housing, including the FHA 203(k) Renovation Loan program in which Ms. Gipson specialized. He directly supervised personnel in HUD Headquarters responsible for the programmatic and policy-making aspects of FHA single family housing

programs, as well as the four major HUD offices around the country which administer HUD's single family programs (Exh. 2 at 2-3).

Mr. Douglas' responsibilities also included oversight of the compliance activities of the Office of Housing, insofar as they involved single family housing.  They entailed reviewing and/or supervising reports and audits prepared by HUD's Office of Inspector General; determining or supervising the determinations of the position of the Office of Housing in response; deciding what action, if any, should be taken in connection with these matters; and interacting with the HUD Mortgagee Review Board, the body responsible for imposing sanctions on FHA-approved lenders(Exh. 2 at 4-5).

During his career with the federal government, Mr. Douglas also served with the U.S. Department of Agriculture and the Federal Deposit Insurance Corporation and was responsible for managing the entire national single family housing program for the Rural Housing Service, for the disposition of distressed real property that had come into the FDIC's possession as a result of banking failures and liquidations. He was also self-employed as a contractor for the Resolution Trust Corporation and was responsible for disposing of real estate that came into the possession of the RTC as the result of failures and liquidations of savings and loan associations (Exh. 2 at 3).

In these positions, Mr. Douglas became knowledgeable about lender practices in the segment of the mortgage loan industry that originates and underwrites non-FHA, or conventional, mortgage loans.  Since his retirement from HUD, Mr. Douglas has been employed consulting on HUD-

related matters, among them attempts to obtain significant contracts from HUD, and originating residential mortgage loans (Exh. 2 at 3).

### The Admissibility of Plaintiff's Expert Report

Mr. Douglas' expertise in the private residential mortgage industry, both FHA and conventional, is unimpeachable (Exh. 2 at 3). So is his familiarity with FHA enforcement policies and activities (Exh. 2 at 4). There is no doubt that Rule 702, Fed. R. Evid., recognizes that Mr. Douglas is qualified as an expert, that his opinions are reliably based in his experience, and that his report is admissible.

"Interpreting" Rule 702, the D.C. Circuit applies "a two-part test for determining the admissibility of expert testimony: the witness (1) must be qualified, and (2) must be capable of assisting the trier of fact." Burkhart v. WMATA, 112 F.3d 1207, 1211 (D.C. Cir. 1997). The Rule expressly provides for expert witnesses whose "specialized knowledge will assist the trier of fact to … determine a fact in issue." That "specialized knowledge" may be the product of "knowledge, skill, experience, training, or education." Id. "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from … specialized experience.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 148-49 (1999) (quoting Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)); accord, Burkhart, supra, 112 F.3d at 1212.

Mr. Douglas has exactly the type of specialized and extensive experience to qualify him to render an expert opinion. His opinion

has a "'valid … connection'" to the factual "'inquiry'" at issue, and the "factual basis" of his opinion is "'reliable'" and based on his "'knowledge and experience.'"  Kumho Tire, supra, 526 U.S. at 149 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993)).  It is, therefore, admissible and does not supplant the jury's function by rendering an opinion on a "finding of ultimate fact," i.e., whether or not Wells Fargo retaliated against Ms. Gipson by terminating her.  Pullman-Standard v. Swint, supra 456 U.S. at 286.

The primary factual inquiries before the Court are whether Wells Fargo's contention that Ms. Gipson engaged in misconduct is credible and, if so, whether that misconduct was sufficiently severe to warrant termination.  Mr. Douglas' expert opinion was designed to complement the factual showing that plaintiff intends to make in opposing summary judgment.  Mr. Douglas did so by demonstrating that the objective view in the private mortgage industry is that responsibility for missing documentation in loan files is not considered the responsibility of loan originators, that Ms. Gipson's actions were common and did not put Wells Fargo at risk of being sanctioned, and that Ms. Gipson's actions are considered by private industry to amount to nothing more than good competitive customer service (Exh. 2 at 2, 6-10).  There is simply no doubt that the "truthfulness" of the subjective reasons articulated by an employer for taking adverse personnel action can be "directly challenged by contrary expert proof."  Coles v. Perry, 271 F.Supp. 2d 157, 162 (D.D.C. 2003) (Facciola, J.) (citing Athridge v. Iglesias, 167 F.Supp.2d 389 (D.D.C. 2001)).

<u>Plaintiff's Expert Conclusions</u>

After reviewing the record – and assuming that Ms. Gipson engaged in conduct not even borne out by Wells Fargo's investigation – Mr. Douglas had no difficulty rendering an expert opinion objectively discounting the alleged seriousness of Ms. Gipson's actions.

> [I]t is by no means uncommon or inappropriate for a loan originator to accept documents by facsimile and not to meet face-to-face with a prospective borrower.
>
> Under accepted FHA practice, 203(k) loans could be underwritten by an approved lender such as Wells Fargo so long as originals of the documents in question were provided at or before loan closing. In other words, when an approved lender's processing or underwriting department determined that original documents such as these had not been provided directly from a prospective buyer, the proper course would have been for the individuals or units of the lender responsible for processing or underwriting 203(k) loans to arrange for their provision before closing.
>
> Further, as an FHA-approved lender, Wells Fargo was required to have a member on its staff specifically designated to ensure that loan packages for all FHA loans extended by Wells Fargo, including 203(k) loans, complied with FHA rules and guidelines. It was that person, rather than a loan originator, who bore the ultimate responsibility to ensure that FHA guidelines were met.
>
> As is true in FHA loans, private mortgage lenders invariably have processing and underwriting departments whose function is to ensure that loans are properly documented and comply with industry and individual lender standards before closing … [A] a mortgage originator who is actively engaged in multiple transactions is not expected to compare information on multiple loan applications; again, this is the function of processing or underwriting.

(Exh. 2 at 6, 8, 9). Simply put, from the objective standpoint of a private mortgage lender, Ms. Gipson's alleged lapses were neither serious nor uncommon, likely to go uncorrected during processing, or grounds to expose Wells Fargo to sanction.

**CONCLUSION**

For the foregoing reasons, plaintiff respectfully urges the Court to deny defendant's Motion to Strike Expert Report.

Respectfully submitted,

/s/
_____
Robert C. Seldon, Esq.
  D.C. Bar No. 245100


/s/
_____
Molly E. Buie, Esq.
  D.C. Bar No. 483767

Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968

Counsel for Plaintiff