## **EXPERT ANALYSIS OF FREDERICK C. DOUGLAS, JR.**

At the request of counsel for plaintiff, Robert C. Seldon, Esq., I have been retained to present an independent expert review of the acts that supposedly led to the termination of Yvonne Gipson, the plaintiff in <u>Gipson v. Wells Fargo Home Mortgage, Inc., et al.</u>, Civil Action No. 05-1184 (D.D.C.) (JMF), which has been consolidated with <u>Gipson v. Wells Fargo Corporation, et al.</u>, Civil Action No. 00-2685 (D.D.C.) (JMF). A copy of my resume is appended to this Report as Attachment A. A copy of my agreement with Mr. Seldon's firm is appended as Attachment B.[1]

Mr. Seldon has designated me as an expert witness who may be used to present evidence at the trial in this matter, and in motions as well. In connection with my services, Mr. Seldon or another attorney with his firm showed me a copy of the Stipulation and Order of Confidentiality agreed to by the parties and entered by the District Court in this case (Att. C). In accordance with the terms of that Order, I have kept all materials designated as confidential by Wells Fargo[2] in confidence and only disclosed their substance as permitted by section 3.

The specific issues that I was retained to evaluate concerned Ms. Gipson's alleged acceptance of faxed documents from realtors, as opposed to originals from borrowers, in connection with one or more Federal Housing Administration ("FHA") 203(k) Renovation Loans and/or conventional loans that she originated and that were underwritten, or potentially underwritten, by Wells Fargo; her alleged utilization of information faxed from realtors to

---

[1] I have not previously given expert testimony or authored publications.
[2] Mr. Seldon has explained to me that there has been some disagreement between the parties about the proper name and/or the proper identity of the defendant(s). The specific meaning of these different denominations is of no real consequence to this Report. For purposes of this Report, the term "Wells Fargo" or defendant(s) includes Wells Fargo Home Mortgage, Inc.; Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.; Wells Fargo Bank, N.A.; and Wells Fargo & Company.

1

complete income statements for potential borrowers; Ms. Gipson's alleged preparation of credit explanations for potential borrowers; and her alleged failure to meet face-to-face with potential borrowers.[3] I also considered whether a mortgage loan originator, as opposed to a loan processor or underwriter, should reasonably be expected to recall specific loan applications and consider the possibility that, when looked at cumulatively, they contained misrepresentation or fraudulent statements.

In forming my opinion, I reviewed the answers provided and documents identified by Wells Fargo in response to Plaintiff's First Set of Interrogatories and Requests for Production of Documents pertaining to the investigation which led to Ms. Gipson's termination, which included the talking points document prepared by Wells Fargo (Att. D), as well as the Talking Points summary prepared by Ms. Gipson. In preparing my opinion, I brought to bear my extensive background in FHA procedure, policy and practice; consulted with one of my former subordinates; and relied upon my own experience in the conventional (non-FHA) segment of the mortgage industry. I reserve the right to amend or supplement this Report in the event that the on-going disclosure and discovery processes bring further relevant information to light.

I served as Deputy Assistant Secretary of Single Family Housing of the Department of Housing and Urban Development ("HUD"), beginning in approximately January of 1999. HUD's Office of Housing is the single most important program office in HUD and responsible for its most important housing programs. As Deputy Assistant Secretary for Single Family Housing, I reported directly to the Assistant Secretary for Housing, an official who holds the dual title of Federal Housing Commissioner. I served in this position until approximately

---

[3] For the purposes of my review, I assumed that Ms. Gipson engaged in these acts and focused on their significance, responsibility for them, and the consequences, if any, that would be expected to follow from them.

November of 2002, when I was reassigned as a Senior Advisor to the President of the Government National Mortgage Association.

During my career, I also served with the U.S. Department of Agriculture and the Federal Deposit Insurance Corporation. In these positions, I was responsible for managing the entire national single family housing program for the Rural Housing Service, for the disposition of distressed real property that had come into the FDIC's possession as a result of banking failures and liquidations, and as a bank examiner. I have also been self-employed as a contractor for the Resolution Trust Corporation and was responsible for disposing of real estate that came into the possession of the RTC as the result of failures and liquidations of savings and loan associations. In these positions, I became knowledgeable about lender practices in the segment of the mortgage loan industry that originates and underwrites non-FHA, or conventional, mortgage loans. Since my retirement from HUD, I have been employed consulting on HUD-related matters, among them attempts to obtain significant contracts from HUD, and originating residential mortgage loans.

A more complete description of my career background can be found in my resume (Att. A).

As Deputy Assistant Secretary for Single Family Housing, I had overall responsibility for HUD programs designed to promote low and moderate income affordable single family housing. I provided direct supervision to the personnel in HUD Headquarters responsible for the programmatic and policy-making aspects of FHA single family housing programs, which included the Office of Single Family Program Development, the Office of Single Family Asset Management, the Office of Lender Activities and Program Compliance, and the Office of Manufactured Housing, as well as to the four major HUD offices around the country which

actually administered HUD's single family programs. In total, approximately 1200 employees were under my supervision

I was responsible for and effected many significant programmatic accomplishments during my tenure as Deputy Assistant Secretary. These accomplishments included, but were not limited to, overseeing an increase in single family home mortgage loan activity by over 20%; increasing staff productivity by 400% while simultaneously effecting a 27% reduction in Headquarters staff and 71% in Field staff; reducing average loan processing time from 7 weeks to 2 days; increasing the recovery and sale of distressed and foreclosed properties in HUD's inventory by 600%; increasing monitoring of FHA approved lenders; increasing training sessions for lenders and industry partners by 900%; and undertaking the complete automation of the HUD single family mortgage loan process. In Fiscal Year 2002 alone, HUD managed a portfolio of approximately 6 million single family home mortgages; insured approximately 1.3 million new single family mortgages; and sponsored ownership of approximately 875,000 single family homes purchased by approximately 700,000 first-time homebuyers, of whom approximately 262,000 were minorities. This was undertaken under my supervision, direct and indirect.

Part of my responsibilities as Deputy Assistant Secretary for Single Family Housing were to oversee the compliance activities of the Office of Housing, insofar as they involved single family housing. This included reviewing and/or supervising reports and audits prepared by HUD's Office of Inspector General; determining or supervising the determinations of the position of the Office of Housing in response; deciding what action, if any, should be taken in connection with these matters; and interacting with the HUD Mortgagee Review Board, the body responsible for imposing sanctions on FHA-approved lenders. I was also instrumental in HUD's utilization of loss mitigation tools, which staved off 34,400 single family foreclosures in FY

2002 alone; enhancement of housing counseling; programmatic changes advancing the Federal Housing Act; restoration of the public trust in HUD/FHA housing programs; and reengineering HUD's Single Family Housing programs by automating underwriting.

One of the single family housing programs under my administration was the FHA 203(k) Renovation Loan program. Like all FHA mortgage programs, FHA did not make mortgages to borrowers, but rather insured mortgages underwritten by approved private lenders. The specific purpose of the 203(k) program was to finance the acquisition and renovation of a specific property, including the cost of renovating the property. Once renovated, the properties had to be owner occupied.

As was true with all FHA programs, the maximum loan to value ratio of a 203(k) loan was determined in accordance with ceilings fixed by HUD/FHA. So were minimum renovation costs. Mortgage insurance, the mechanism by which FHA encourages private lenders to underwrite FHA loans, which in turn encourages the construction and enhances the affordability of housing, was provided through the General Insurance Fund. In most if not all significant respects, standard FHA Underwriting Guidelines applied to the 203(k) program.

It is my understanding that in documenting and/or verifying income of potential 203(k) borrowers, Ms. Gipson accepted pay stubs and W-2 forms faxed to her by realtors and, at times, utilized that information in preparing credit and income statements that were submitted to Wells Fargo loan processors and, possibly, underwriters. It is correct that FHA guidelines require that original documents such as these be provided from potential borrowers. It is also true that in FHA and conventional practice, underwriters and loan processors can and often do request original documents and condition closings on the receipt of those documents, although on one or more occasions, Wells Fargo underwrote 203(k) loans without this having happened.

For several reasons, in my expert opinion, Wells Fargo's failure to obtain originals of the foregoing documents directly from borrowers would not, in FHA practice and procedure, provide grounds for taking action against the individual mortgage originator or Wells Fargo.

Under accepted FHA practice, 203(k) loans could be underwritten by an approved lender such as Wells Fargo so long as originals of the documents in question were provided at or before loan closing. In other words, when an approved lender's processing or underwriting department determined that original documents such as these had not been provided directly from a prospective buyer, the proper course would have been for the individuals or units of the lender responsible for processing or underwriting 203(k) loans to arrange for their provision before closing.

Further, as an FHA-approved lender, Wells Fargo was required to have a member on its staff specifically designated to ensure that loan packages for all FHA loans extended by Wells Fargo, including 203(k) loans, complied with FHA rules and guidelines. It was that person, rather than a loan originator, who bore the ultimate responsibility to ensure that FHA guidelines were met. One of the reasons to designate one such person is that the FHA Manual and other regulatory guidelines are quite complex, so much so that only an individual devoted to this particular duty could be expected to be fully knowledgeable about FHA practices and requirements and able to keep current about them, as well.

To my knowledge, neither the HUD Office of Inspector General nor the Office of Housing recommended that an approved lender or mortgage originator be sanctioned or sanctioned any approved lender or mortgage originator during my tenure for failing to arrange for the delivery of original documents such as those identified above from single family or 203(k) borrowers prior to closing. Neither has the HUD Mortgagee Review Board. Based on

my expert opinion, in the absence of fraud or systematic abuse by an approved lender, such a sanction would not be warranted and would not have been imposed by the Office of Housing, the FHA programmatic office that would make the final determination whether any sanction should be imposed. It is understood by all HUD/FHA offices that have a role to play in monitoring the activities of approved lenders and determining what sanction, if any, should be imposed, that mistakes are made by lenders in processing the large number of FHA insured loans that are needed to fulfill HUD's nationwide program objective, and that HUD and the FHA rely in the first instance on approved lenders themselves to monitor their own activities and uncover any deviations from FHA rules and guidelines. It would be counter-productive to this third goal to sanction approved lenders and their personnel for uncovering underwriting issues on their own.

Furthermore, it would be impossible for a loan originator to be involved in a fraud ring unless a loan processor or underwriter was also a participant, for the reason that at least one such individual would have had to approve a loan package and a loan. In my opinion, it would likely take a minimum of five people – an originator, processor/underwriter, borrower, appraiser, and closing agent – to obtain a loan by fraud. A title company might also have to be involved.

The possibility of the Office of Housing or the Mortgagee Review Board imposing a sanction would be reduced to virtually nothing if such a matter were discovered by an approved lender without or before any action by HUD or FHA. In my expert opinion, if such a matter had somehow been brought to my attention for action in my former role as Deputy Assistant Secretary for Single Family Housing, under the circumstances present here, I would have found it inconsistent with FHA/HUD practice to impose a sanction and would not have done so.

In my opinion, referrals to the HUD Mortgagee Review Board are likely to be made when a particular lender has a high default rate, in which case that lender's loan portfolio or a

significant portion of it might be scrutinized and the mortgagee placed on prior review. Consistent with this practice, individual loans were not referred to the Mortgagee Review Board, but rather blocks of loans involving suspect activity.

Consistent with this practice, HUD has an electronic program called Neighborhood Watch that tracks default rates among all HUD approved lenders. If the program detects a problem with a particular lender, HUD's Office of Lender Activities and Program Compliance will be triggered to perform a Quality Assurance Review (QAR). Depending on the results of the QAR, the matter might be referred to the Mortgagee Review Board, where the lender will have the opportunity to explain their side of things and cure any problems. I am not aware that in this litigation, Wells Fargo has taken the position that it had a default rate that caused or threatened referral to the Mortgagee Review Board, or that its loans were considered suspect as a result of being electronically monitored.

Based on my experience at HUD, I find it highly unlikely that an approved FHA lender like Wells Fargo would be subject to review, scrutiny or sanction, much less that it would terminate a successful residential mortgage loan originator, for not having obtained original income or other loan documents directly from a prospective borrower prior to closing, as opposed to from the borrower's realtor, in the absence of systematic fraud or abuse by the mortgagee that caused significant loss to HUD.

I find it equally unlikely that a mortgagee engaged in underwriting conventional mortgage loans would take action against an originator for the acts attributed to Ms. Gipson. As is true in FHA loans, private mortgage lenders invariably have processing and underwriting departments whose function is to ensure that loans are properly documented and comply with industry and individual lender standards before closing. In practice, mortgage originators work

on commission or with a small salary or draw against commission to originate mortgage loans; their performance is measured against production standards; and that is essentially what they are expected to do, although performance plans often do refer to documenting loans. Processing and underwriting departments are staffed with the personnel who review loan documentation for completeness and borrower satisfaction of income and credit requirements and who perform needed follow-up with borrowers in the event that documentation is absent or questioned. For these same reasons, a mortgage originator who is actively engaged in multiple transactions is not expected to compare information on multiple loan applications; again, this is the function of processing or underwriting.

Further, it is by no means unusual or inappropriate in conventional mortgage loans for a loan originator to type a credit explanation for a client, as long as the client has dictated it or provided the substance of the explanation. This is a typical act of customer service provided by loan originators and is necessary for them to remain competitive. By the same token, it is by no means uncommon or inappropriate for a loan originator to accept documents by facsimile and not to meet face-to-face with a prospective borrower. These are regular practices in the conventional mortgage loan industry and, again, ones that a successful originator is all but required to follow in order to be competitive. As stated before, actions such as these do not provide grounds for the termination of a successful loan originator.

Overall, the acts that Ms. Gipson allegedly committed, and I reiterate that I assumed for purposes of this Report that she did, were not unusual or uncommon, either in the context of an FHA or a conventional mortgage loan. They did not endanger Wells Fargo's status as an approved FHA lender, and did not suggest that Ms. Gipson was derelict in her responsibility as a loan originator. The acts she engaged in are common throughout the mortgage loan industry and

often viewed as a part of customer service. The fact that original documents were needed before a particular mortgage loan should have been closed, as well as the possibility of detecting suspected fraud or misrepresentation, are viewed by HUD/FHA and the conventional residential mortgage industry as the responsibility of loan processors and underwriters, not loan originators.

_____
Frederick C. Douglas, Jr.
Date: 5/30, 2006