00001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - -X
YVONNE GIPSON,            :
                          :
   Plaintiff,            :
                          :
vs.                       : Civil Action No.
                          : 05-1184 (JMF)
WELL FARGO HOME           :
MORTGAGE, INC.,           :
                          :
   Defendant.            :
- - - - - - - - - - - - -X
YVONNE GIPSON,            :
                          :
vs.                       : Civil Action No.
                          : 00-2865 (JMF)
WELLS FARGO CORPORATION, :
et al.,                   :
                          :
   Defendants.           :
- - - - - - - - - - - - -X

DEPOSITION OF LOYCE GENTRY,
taken by the Counsel for the Plaintiff before Eileen
Hicks, Certified Shorthand Reporter of the State of
Iowa, at 317 Sixth Avenue, Suite 606, Des Moines,
Iowa, commencing at 8:30 a.m., Tuesday, May 23, 2006.
EILEEN HICKS - CERTIFIED SHORTHAND REPORTER

00104
1  identified as document variance, meaning a material
2  misrepresentation, et cetera.
3  Did you have any reason to believe that that
4  was not--that that was disproven during the
5  investigation?
6  A. No.
7  Q. Looking through this memo, was there
8  anything in your investigation that you disapproved?
9  "This memo" being the memorandum of the preliminary
10 report Bates No. 4717 through 4720.
11 MS. KHAN: Object to the form.
12 Go ahead.
13 A. No.
14 MR. SELDON: Okay. Put that aside for a
15 minute.
16 I say let's take five, let me organize the
17 notes for the next and final segment of the
18 deposition, and do whatever we can to get you out of
19 here on time.
20 (Short recess.)
21 MR. SELDON: Okay. Let's go back on.
22 Q. All right. I take it you were personally
23 involved into the investigation involving the
24 plaintiff Yvonne Gipson?
25 A. Yes.

```
00105
 1  Q.  And what role or roles did you play?
 2  A.  I reviewed file documentation. I took
 3  pictures of some of the houses that she had done
 4  loans on. And because of circumstances, I conducted
 5  the interview.
 6  Q.  The circumstance being that Mr. Smith's
 7  group wasn't available.
 8  A.  Mr. Smith was not available.
 9  Q.  The interview that you conducted, was there
10  someone else who witnessed it?
11  A.  Yes.
12  Q.  Who was that?
13  A.  Ann Tankis [phonetic].
14  Q.  Who is she?
15  A.  Ann Tankis is a Wells Fargo Home Mortgage
16  employee in Rockville, Maryland.
17  Q.  Do you know what her job is?
18  A.  She is a director of divisional sales.
19  Q.  Did your role in this matter continue after
20  you conducted the interview?
21  A.  In what sense?
22  Q.  Really any. Because you said you reviewed
23  file documents, you took pictures of houses, you
24  conducted an interview with Ms. Tankis present?
25  A.  My role was presenting information to the
```

```
00111
 1  whether her activities had to be reported to any
 2  federal agency?
 3  MS. KHAN: Same objection.
 4  MR. SELDON: Please go ahead.
 5  A. I don't recall.
 6  bY MR. SELDON:
 7  Q. Do you recall telling Ms. Gipson one way or
 8  another that loans that she had originated had caused
 9  monetary loss for Wells Fargo?
10  A. Yes.
11  Q. What did you tell her?
12  A. We discussed the loans, that I had driven
13  around and taken pictures of the houses and reported
14  the losses that were involved and the failure of
15  those properties to be completed in a timely fashion
16  under the renovation program.
17  Q. So you told her that Wells Fargo had
18  incurred loss. Is that right or wrong?
19  A. I can't specifically say that we had or that
20  there was a likelihood. I don't specifically recall.
21  I recall discussing losses involving those loans.
22  Q. Do you recall telling her whether the loans
23  that were the subject of your investigation were
24  fraudulent?
25  A. Yes.
```

00123
1  A. Not specifically by loan, no.
2  Q. Overall?
3  A. Overall there was misrepresentation.
4  Q. Did anyone submit false pay stubs, to your
5  recollection?
6  A. There were, yes.
7  Q. Did any of the pay stubs not correspond to
8  the 1040s that were filed with the government?
9  A. Yes.
10 Q. And did any of the pay stubs-- No, sorry.
11 That's fine.
12 Let's take a look at page 2.
13 It says here Ms. Nathe-Fligge reviewed 19
14 out of 24 loans, 13 loans documented for
15 misrepresentation of which three have suspected
16 misrepresentation, 6 of 19 with no variance.
17 What does it mean to say 13 of 19 loans
18 documented for misrepresentation?
19 A. We have proven that the information provided
20 and used in approving a loan was misrepresentation.
21 Q. And during the course of your investigation
22 did you prove, to your satisfaction, that Ms. Gipson
23 was aware of that at the time?
24 A. No.
25 Q. Three loans have suspected misrepresentation.

00124
1  what does that mean?
2  A. It means that we could not validate the
3  information, either to prove or disapprove.
4  Q. And during the course of your investigation
5  did you conclude one way or another whether or not
6  Ms. Gipson knew that those three loans did or did not
7  have misrepresentation in them?
8  A. I don't know which specific three loans
9  those were so I can't answer that.
10 Q. And 6 out of 19 loans with no variance means
11 they contained no misrepresentation?
12 A. That is correct.
13 Q. Okay. Let's go back and take a look at
14 Exhibit 1 again.
15 Femi Adebayo on the first page, this is one
16 that did you say you were involved with or knew about
17 as a result of the Fraud Risk Management group's
18 activities?
19 A. It was disclosed to the Fraud Risk
20 Management group, but, no, that's not how we came to
21 know about it.
22 Q. No, no. How did you come to know about it?
23 How did you come to know about it?
24 A. I was contacted by the customer.
25 Q. Okay. And was there a conclusion by the

00125
1  Fraud Risk Management Committee whether or not
2  Mr. Adebayo personally engaged in fraud?
3  A.  That conclusion was based on his written
4  statement, that, yes, he did.
5  Q.  Okay.  And is the same true of Cathy Gyolai?
6  A.  Yes.
7  Q.  Was the same true of Mr. Wilson?
8  A.  No.
9  Q.  He was just inconsistent in the account--
10 Oh, we talked about that one.  Okay.  Let's move on.
11 Let's look at the next page of this Exhibit 1.
12 Do you know anything about Palacios?
13 A.  No.  Let's see --
14 Q.  Mecler I think you said you knew about, you
15 interviewed him?
16 A.  No.  I didn't interview anyone on page 2.
17 Q.  What was your--if you don't mind refreshing
18 my recollection, which I'm supposed to be doing for
19 you, you had some knowledge I think of Mr. Mecler's
20 situation?
21 A.  Yes, I did.
22 Q.  And was there a conclusion in that
23 investigation, if you know, that Mr. Mecler engaged
24 in fraud?
25 A.  It was evidenced through an e-mail that he

00126
1  wrote.
2  Q.  Right.  Showing you that he engaged in
3  fraud?
4  A.  Yes.
5  Q.  And what about Christopher Newman, were you
6  involved in that, or do you know about it by your
7  work in the Fraud Risk Management Department?
8  A.  I would have been made aware of it in our
9  Fraud Risk Management meeting; but to say
10  specifically that I worked on it, no, I did not.
11  Q.  Do you remember one way or another whether
12  it was concluded that Mr. Newman engaged in fraud?
13  A.  I don't know from looking at this.
14  Q.  Okay.  And nothing comes to mind in
15  recollection?
16  A.  No.
17  Q.  Okay.  Let's look at the next page.
18  Sondra Hayes.
19  A.  I was not involved in that one.
20  Q.  And so no way of knowing about her or that
21  the Fraud Risk Management group concluded that she
22  engaged in fraud?
23  A.  I can't speak for the group, but for myself
24  I was not involved with that one so I can't address
25  that one.

00127
1  Q.  Cedric Johnson, I think you said the
2  interview you were involved with?
3  A.  Yes.
4  Q.  Did you reach a conclusion on whether he was
5  involved in actual fraud?
6  A.  We reached a conclusion that he was
7  responsible for the documentation that was in his
8  files. The documentation was fraudulent, thereby he
9  was responsible for what was in the file.
10 Q.  Okay. And were you involved with Michael
11 Quintero?
12 A.  Yes, I was.
13 Q.  And there was a determination by management
14 that he was not engaged in any fraud, I take it?
15 A.  Yes.
16 MR. SELDON: Okay. Let me look at my notes
17 for a second.
18 (Short recess.)
19 MR. SELDON: Okay. Ms. Gentry I've got a
20 few more questions as always.
21 Q.  I take it one of the things you concluded is
22 that Ms. Gipson accepted faxed documents from
23 Realtors?
24 A.  Yes.
25 Q.  And this was a violation of some policy or

```
00128
 1  something or other?
 2  A.  Yes.
 3  Q.  What, if you could tell me?
 4  A.  It's a violation of Wells Fargo policy.
 5  It's a violation of HUD policy.
 6  Q.  And I think you concluded she didn't meet
 7  face-to-face with borrowers.  Is that right?
 8  A.  I don't know that that was a conclusion that
 9  I made.
10  Q.  Okay.  Did you conclude that she wrote
11  credit explanations for borrowers?
12  A.  I think that was something we discussed.
13  Q.  And do you recall your conclusion one way or
14  the other?
15  A.  No.  I didn't address that as an issue.
16  Q.  Okay.  And I think-- Let me just be clear
17  about this.  After the interview of Ms. Gipson, was
18  there any file report or memoranda or anything,
19  anything committed to writing, codifying the results
20  of your investigation?
21  A.  No.  It was the fraud committee discussion.
22  Q.  And that's all verbal?
23  A.  Yes.
24  Q.  So I guess I should go back.  We talked
25  about the fax documents as something that you
```

00129
 1  concluded Ms. Gipson did in violation of Wells Fargo
 2  and HUD policy?
 3  A.  Yes.
 4  Q.  What else did you believe or conclude that
 5  Ms. Gipson did that violated Wells Fargo-- Let's
 6  start with anything else she violated of HUD policy?
 7  A.  I don't think we addressed anything else.
 8  Q.  Okay.  What about Wells Fargo policy?
 9  A.  I think there was a concern of taking
10  information to complete the initial application,
11  taking that from a third party.  I think we discussed
12  that.
13  Q.  And the third party would be Realtors, or
14  something?
15  A.  Yes.
16  Q.  As opposed to borrowers?
17  A.  As opposed to the individual, yes.
18  Q.  And is that a violation of Wells Fargo
19  policy?
20  A.  Yes.  That's a violation of the application
21  also.  It states at the end that the information is
22  correct and accurate.
23  Q.  I understood you to say she initially took
24  the information?
25  A.  That's the initial application, yes.

00130
1   Q.  Okay. Did you conclude one way or another
2   whether there was any information on the application
3   that had been initially taken from Realtors that was
4   not verified with the borrower?
5   A.  No, I made no conclusion on that.
6   Q.  Okay. Were there any other Wells Fargo
7   policies that you concluded Ms. Gipson had violated?
8   A.  Not that I recall. We addressed mainly the
9   document procurement.
10  Q.  When you say "we addressed mainly," what do
11  you mean?
12  A.  That was the issue that we discussed as
13  being the avenue for allowing the fraudulent
14  documents to become part of the loan file.
15  Q.  And this is faxed documents from Realtor?
16  A.  Yes.
17  Q.  Okay. What else, if anything, formed the
18  basis of the Fraud Risk Committee recommendation to
19  terminate Ms. Gipson?
20  A.  As is standard with any recommendation, we
21  consider each case on its own issues. We don't have
22  a standard set guideline that we check off if it's
23  this many. It's based on all the various aspects of
24  the facts that we consider, the different segments.
25  Q.  Anything else come to mind other than what